**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

LAROSHA BELLAMY,

|                              | Plaintiff, | 6:25-cv-1505 |
|---|---|---|
|                              |            | (ECC/ML)     |

v.

APPLEGREEN NY TRAVEL PLAZAS LLC,

Defendant.

---

Morgan L. Mickelsen, Esq., *for Plaintiff*
Jeffrey D. Coren, Esq., *for Defendant*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

Plaintiff LaRosha Bellamy brings this action against her former employer, Defendant
Applegreen NY Travel Plazas LLC, alleging claims under Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq. (Title VII); 42 U.S.C. § 1981; New York State Human Rights
Law, N.Y. Exec. Law § 290 et seq. (NYSHRL); and New York Labor Law § 740. Dkt. No. 1.
Presently before the Court is Defendant's partial motion to dismiss the Complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 14. The motion is fully briefed. Dkt. Nos. 16,
17. For the following reasons, Defendant's motion to dismiss is granted in part and denied in part.

I.    **BACKGROUND**

A.    **The Complaint[1]**

Defendant owns and operates "retail plaza petrol stations commonly found throughout state
and national highway systems." Dkt. No. 1 ¶ 10. On October 24, 2023, Plaintiff, a Black woman,

---

[1] These facts are drawn from the Complaint. The Court assumes the truth of, and draws reasonable
inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67,

began working for Defendant as a Team Member at a Dunkin Donuts retail store located at Defendant's plaza on the New York State Thruway in Frankfort, New York. *Id.* at ¶¶ 7, 14. Plaintiff's supervisor was Plaza Manager Donald Almond. *Id.* at ¶ 16.

### 1.     Food Safety Issues

During the first few weeks of Plaintiff's employment, Mr. Almond "instructed Plaintiff and other employees to sell food past its expiration date" and "change date labels when state health inspectors conducted on-site inspections." *Id.* at ¶ 18. Plaintiff "voice[d] her opposition" to these instructions on "many occasions," stating "There are kids eating this food" and "You're not being honest about the food." *Id.* at ¶ 19. In response, Mr. Almond "would yell at Plaintiff aggressively." *Id.* at ¶ 20.

On November 16, 2023, Plaintiff emailed Human Resources employee Sheri Mosley to express her concerns about food safety. *Id.* at ¶ 21. Ms. Mosley told Plaintiff that she was "nitpicking" and, despite Plaintiff's "reports of illegal food safety issues," Defendant "did not make any efforts to investigate or remediate her concerns." *Id.* at ¶ 22. On November 17, 2023, Mr. Almond approached Plaintiff at work and "handed her unemployment application papers, stating that he planned on cutting her hours and would eventually terminate her." *Id.* at ¶ 23. That week, Mr. Almond cut Plaintiff's hours from 30-38 hours per week to 22 hours per week "in retaliation for Plaintiff's complaints of unlawful food safety procedures by Defendant." *Id.* at ¶ 24. After Plaintiff complained to Ms. Mosley, her normal hours were restored the following week. *Id.* at ¶ 25.

---

74-75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2.    Store Supervisor Position

In late November 2023, Plaintiff applied for a promotion to be store supervisor. *Id.* at ¶ 27. At least two other individuals applied for the promotion: another "employee of color" and "one white employee named Savannah Moore." *Id.* Defendant promoted Ms. Moore, "despite Plaintiff and the other applicant of color being more experienced and qualified for the promotion." *Id.* at ¶ 28. Plaintiff contacted Ms. Mosley by telephone on December 5, 2023 to "complain that she was being treated unfairly and that she felt she was not promoted due to unlawful discrimination based on her race." *Id.* at ¶ 29. Ms. Mosley did not agree with Plaintiff's conclusion, "minimized Plaintiff's concerns[,] and patently refused to take any further steps to investigate Plaintiff's complaint of unlawful discrimination." *Id.* at ¶ 30.

Shortly thereafter, Ms. Moore resigned her position and, on December 31, 2023, Mr. Almond informed Plaintiff that she would be promoted to store supervisor as a result of Ms. Moore's departure. *Id.* at ¶¶ 31-32. Around the time of Plaintiff's promotion, Ms. Mosley requested a meeting to discuss Plaintiff's "grievances surrounding her promotion and complaints of discrimination." *Id.* at ¶ 33.

### 3.    Allegations of Racially Hostile Work Environment

Plaintiff alleges that she "continued to experience a racially hostile work environment" despite multiple complaints to Human Resources. *Id.* at ¶ 34. In December 2023, Plaintiff asked her co-supervisor, Krista Franklin, a question about the register. *Id.* at ¶ 35. Ms. Franklin attempted to ignore Plaintiff, who repeated her question. *Id.* Ms. Franklin then "turned to Plaintiff and stated, 'Don't talk to me like that you ghetto black bitch.'" *Id.*

Later that day, while Plaintiff counted the money in a register drawer, Ms. Franklin asked her a question. *Id.* at ¶ 37. When Plaintiff asked Ms. Franklin to give her a second to finish counting the drawer she was working on, Ms. Franklin "became irate, yelling at Plaintiff that she should

have 'never become a manager' and only got the job because Moore quit." *Id.* at ¶ 37. Ms. Franklin then called Store Manager Jennifer Tripple, who came to Plaintiff's worksite and "began berating Plaintiff for the disagreement between Plaintiff and Franklin." *Id.* at ¶ 38. Plaintiff withdrew herself from the situation and texted Mr. Almond, stating that she "felt threatened" and informing him that Ms. Franklin had called Plaintiff a "ghetto black bitch." *Id.* at ¶¶ 38-39.

Mr. Almond came to work the following day and "instructed Plaintiff not to go directly to Human Resources, and instead to write him a statement on what happened." *Id.* at ¶ 40. The day after that, Mr. Almond met with Plaintiff and Ms. Franklin and told them, "I need you guys to work together." *Id.* at ¶ 41.

### 4.    January 2024 Meeting

In January 2024, Plaintiff met with Ms. Mosley, Mr. Almond, and District Manager David Kolek to discuss the promotion to store supervisor and the reasons Plaintiff was not initially chosen. *Id.* at ¶ 42. Plaintiff informed the others that "she felt as though Human Resources did not take her concerns seriously because of her race." *Id.* at ¶ 43. Ms. Mosley "brushed off Plaintiff's concerns" and throughout the meeting "continued to minimize and brush off Plaintiff's complaints of race discrimination and a hostile work environment." *Id.*

Plaintiff began crying after the meeting, at which time Mr. Kolek told her he was sympathetic but that Human Resources "doesn't like to hear the words 'discrimination' and 'hostile work environment' because it makes them uncomfortable." *Id.* at ¶ 44. When Plaintiff asked Mr. Kolek "what she should do as she felt that she was being discriminated against" and "felt compelled to resign," Mr. Kolek told Plaintiff she should "stick it out." *Id.* at ¶ 45.

**5.    Further Allegations of Racially Hostile Work Environment and October 2024 Write-Up**

In May 2024, Defendant hired Alexiss Miner, who became a supervisor within three weeks. *Id.* at ¶ 46. Ms. Miner "made a number of discriminatory and racially charged comments, including using racial epithets." *Id.* at ¶¶ 47-49. Plaintiff told Ms. Miner that "use of the N-word was inappropriate," but Ms. Miner "continued to use the N-word in the workplace." *Id.* at ¶¶ 49-50.

In October 2024, Defendant hired Team Member Miranda Mortiese. *Id.* at ¶ 52. Mr. Almond and Ms. Miner "began to disparage Plaintiff" to Ms. Mortiese, telling her that Plaintiff "was not a 'real supervisor'" and that Ms. Mortiese "did not have to listen" to her. *Id.* at ¶ 53. Ms. Mortiese therefore "would often act in a rude manner towards Plaintiff and even curse her openly while at work." *Id.*

Around the same time, Plaintiff learned from another coworker that Ms. Miner "continued to use the N-word at work." *Id.* at ¶ 54. Plaintiff reported this to Mr. Almond and Human Resources employee Susan Raimondi on October 23, 2024. *Id.* at ¶ 55. Mr. Almond stated that he would talk to Ms. Miner and that, if she continued to use the epithet, "there would be weekly sit-down meetings with Ms. Miner and Plaintiff to 'work out [their] differences.'" *Id.*

On October 24, 2024, the day after complaining about Ms. Miner, Plaintiff "received a write up for allegedly 'recording' underage employees dancing, though Plaintiff did not do so." *Id.* at ¶ 56. Ms. Mosley told Plaintiff the next day via email that the write-up would be "disregarded." *Id.* at ¶ 57. On October 30, 2024, Plaintiff "categorically denied" the contents of the write-up to Ms. Mosley and complained that it was "retaliation for her prior complaints" against Mr. Almond and Ms. Miner. *Id.* at ¶ 58.

Despite Plaintiff's complaints, Ms. Miner continued to use the N-word in the workplace. *Id.* at ¶ 59. When Plaintiff brought this to Mr. Almond's attention, he told her that he was "not

doing shit" and would "not force Miner to 'deal with [Plaintiff's] bullshit,'" and called Plaintiff a liar. *Id.* at ¶¶ 60-61.

In early December 2024, Plaintiff's coworker Amelia "began to make jokes predicated upon racial stereotypes" by "mockingly ask[ing] Plaintiff if she preferred watermelon or grape flavored candy." *Id.* at ¶ 63.

### 6.    2025 Time Off and Schedule Change

On January 2, 2025, Plaintiff needed to leave work to care for her child. *Id.* at ¶ 64. As Plaintiff left work to go to the hospital, she got in a car accident resulting in minor injuries. *Id.* at ¶ 65. Plaintiff "called out of work the following few days" after the accident and "provided medical documentation" to Mr. Almond and Human Resources. *Id.* at ¶ 67. Ms. Miner texted Plaintiff demanding that Plaintiff send her the documentation even though Plaintiff had already provided it to Mr. Almond and Human Resources, *id.* at ¶ 68, and Mr. Almond "became angry" that Plaintiff could not work while she recovered, *id.* at ¶ 69.

When Plaintiff returned to work on January 9, 2025, she saw that Mr. Almond had marked her as having an unexcused absence on January 8, a day for which Plaintiff provided medical documentation. *Id.* at ¶ 70. Plaintiff viewed Mr. Almond's failure to excuse her absence as "retaliation for her complaints of discrimination, as well as a form of race-based discrimination." *Id.* at ¶ 71. Mr. Almond often modified the timecards of other late employees, like Ms. Miner, to "protect[] them from the repercussions of their poor attendance." *Id.* at ¶ 72.

In February 2025, the Dunkin Donuts store where Plaintiff worked changed from being open 24 hours a day to closing at 7:00 p.m. *Id.* at ¶ 74. Plaintiff was assigned the closing shift from 12:00 p.m. to 8:00 p.m. *Id.* at ¶ 75. When Plaintiff informed Mr. Almond that "she needed morning shifts as she had childcare obligations in the evening," Mr. Almond "became irate and began to yell at Plaintiff, stating that he would not accommodate her hours in any way." *Id.* at ¶¶ 76-77.

6

Plaintiff "became upset and pointed out that she was a senior manager with more seniority than other employees," including Ms. Miner. *Id.* at ¶ 78. Plaintiff told Mr. Almond that she was aware that Mr. Almond fixes Ms. Miner's timecard in the system when she is late and that Plaintiff viewed this favoritism as "disparate treatment based on her complaints about Almond and the racially motivated hostile work environment." *Id.* at ¶ 79. Mr. Almond responded that "Plaintiff was the one making the work environment hostile due to her complaints to Human Resources." *Id.* at ¶ 80.

### 7.    Assistant Manager Position & Plaintiff's Resignation

On August 28, 2025, Plaintiff learned that Mr. Almond's cousin would become Assistant Manager, a position in which Plaintiff "had openly expressed interest . . . and felt she was qualified for." *Id.* at ¶ 82. Mr. Almond had "previously assured Plaintiff that she would be the first candidate to be considered for [the] Assistant Manager position if she consistently worked holidays and weekends." *Id.* Plaintiff "expressed her view" that "she found it unfair and inequitable that Almond would instead put a family member of his with less experience in the role." *Id.* at ¶ 83.

On September 1, 2025, Plaintiff's coworker Nicole Delude informed Plaintiff that Mr. Almond had "referred to a Black customer as the N-word the week before." *Id.* at ¶ 85. Plaintiff reported this incident to Ms. Raimondi by email. *See id.* at ¶ 86.

On September 2, 2025, Mr. Almond's cousin began work as Assistant Manager. Plaintiff emailed Ms. Raimondi "complaining that Almond refused to promote Plaintiff due to her race." *Id.* at ¶ 87. Ms. Raimondi met with Plaintiff regarding her complaint on September 3, 2025, and Ms. Mosley attended virtually. *Id.* at ¶ 89. Both assured Plaintiff they would investigate her reports. *Id.* Ms. Mosley subsequently met with Mr. Almond, who "accused Plaintiff of lying in her complaints." *Id.* at ¶ 90.

On September 11, 2025, Plaintiff emailed Ms. Mosley requesting an update on the Human Resources investigation. *Id.* at ¶ 91. Ms. Mosley was "confused as to what investigation Plaintiff was inquiring about and continued to ask clarifying questions." *Id.* at ¶ 92. Ms. Mosley "eventually stopped responding to Plaintiff without offering any update." *Id.*

On September 29, 2025, Mr. Almond issued Plaintiff a write-up, with Ms. Raimondi virtually present, for violating company policy on September 19 "by eating on the job." *Id.* at ¶ 93. Although Plaintiff had worked with Mr. Almond on September 19 and September 22, Mr. Almond did not address this "alleged violation of company policy" with her. *Id.* at ¶ 94. Plaintiff emailed Ms. Mosley complaining of retaliation on September 29. *Id.* at ¶ 96. Later that evening, Plaintiff emailed Ms. Mosley and Ms. Raimondi again about the "retaliatory write up." *Id.* at ¶ 97. Plaintiff did not receive a response to either of her emails. *Id.* at ¶ 98.

On October 3, 2025, Plaintiff observed Mr. Almond assure another employee who was eating on the clock that "it was okay to eat at work." *Id.* at ¶ 99. "No longer able to tolerate Defendant's discriminatory and hostile work environment, Plaintiff submitted her resignation via email to Mosley and Raimondi." *Id.* at ¶ 101.

## B.    Proceedings Before the EEOC

Plaintiff alleges that she "has satisfied all of the procedural prerequisites for the commencement" of this action because she timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on January 28, 2025 (the EEOC Charge); received a Notice of Right to Sue from the EEOC on August 21, 2025; and thereafter commenced this action within 90 days. *Id.* at ¶ 5. The EEOC's August 21, 2025 right-to-sue letter is attached as an exhibit to the Complaint. Dkt. No. 1-1.

Defendant submitted with its motion to dismiss a copy of Plaintiff's January 28, 2025 EEOC Charge. Dkt. No. 14-2. The EEOC Charge, which Plaintiff filed pro se, alleges that (1)

8

Plaintiff was written up on October 19, 2024 for allegedly recording minor employees dancing while on shift in violation of Defendant's cellphone use policy; (2) an employee named "Alexis" freely used racial epithets at work; and (3) Mr. Almond "yelled" at and "humiliate[d]" Plaintiff on January 20, 2025 when she asked another employee to return to work. *See id.*

In her opposition memorandum of law, Plaintiff states that, with the help of counsel, she filed an amended Charge of Discrimination with the EEOC on March 14, 2025 (the Amended EEOC Charge). Dkt. No. 16 at 13.[2] Plaintiff further states that Defendant filed its "Position Statement with the EEOC via the EEOC Portal" on March 20, 2025, and Plaintiff filed a Rebuttal to Defendant's Position Statement on June 2, 2025 (the Rebuttal). *Id.* In addition to the EEOC Charge and right-to-sue letter, Plaintiff attaches to her opposition her counsel's March 3, 2025 notice of appearance with the EEOC (Dkt. No. 16-2), the Amended EEOC Charge (Dkt. No. 16-3), and her Rebuttal (Dkt. No. 16-4). The Amended EEOC Charge contains more detailed allegations than the original EEOC Charge. *See generally* Dkt. No. 16-3.

Defendant asserts in reply that it "was not aware of a purported Amended EEOC Charge until Plaintiff filed her opposition" to its motion to dismiss. Dkt. No. 17 at 5.

## II.     LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level[.]" *Id.* (quoting *Twombly*, 550 U.S. at 555). A

---

[2] Unless otherwise noted, citations to page numbers refer to the pagination generated by the CM/ECF system.

court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    DISCUSSION

The Complaint asserts claims against Defendant for: (1) discrimination and retaliation under Title VII (first and second causes of action); (2) discrimination and retaliation under 42 U.S.C. § 1981 (third cause of action); (3) discrimination and retaliation under the NYSHRL (fourth and fifth causes of action); and (4) whistleblower retaliation under New York Labor Law § 740 (sixth cause of action). Dkt. No. 1 ¶¶ 112-31. Defendant moves to dismiss Plaintiff's Title VII claims to the extent they fall outside the scope of Plaintiff's EEOC Charge and moves to dismiss the Section 1981 and Labor Law claims for failure to state a claim. *See* Dkt. No. 14.

### A.    Title VII Claims

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (citations omitted). It is well-settled that the requirement to exhaust administrative remedies "is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement." *Id.* (citation omitted); *see generally Fort Bend County, Tex. v. Davis*, 587 U.S. 541 (2019) (holding that Title VII's charge-filing precondition to suit is not jurisdictional but a claim-processing rule). Thus, the "burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense." *Hardaway*, 879 F.3d at 491.

10

Defendant moves to dismiss Plaintiff's Title VII claims to the extent those claims fall outside the scope of Plaintiff's January 28, 2025 EEOC Charge for failure to exhaust administrative remedies. Dkt. No. 14-3 at 8-10. Defendant contends that Plaintiff's Title VII claims should therefore be limited to the events alleged in the EEOC Charge occurring in October 2024 and January 2025 and the alleged epithets of co-worker Alexiss Miner. *Id.* Plaintiff argues that her Title VII claims were before the EEOC in her EEOC Charge, Amended EEOC Charge, and Rebuttal, and that any claims occurring after the EEOC investigation are reasonably related to the claims asserted before the EEOC. Dkt. No. 16 at 14-25. In reply, Defendant asserts that it "only learned of the purported Amended EEOC Charge in the context of this motion" and that the Amended EEOC Charge and Rebuttal should not be considered by the Court. Dkt. No. 17 at 6.

The Court will consider the EEOC right-to-sue letter, which is attached as an exhibit to the Complaint, and the EEOC Charge, which is incorporated by reference in and relied on by the Complaint. *See Littlejohn v. City of New York*, 795 F.3d 297, 305 n.3 (2d Cir. 2015) (noting that it is "proper" to consider the plaintiff's "relevant filings with the EEOC" on a Rule 12(b)(6) motion to dismiss "so long as those filings are either incorporated by reference or are integral to and solely relied upon by the complaint") (brackets and internal quotation marks omitted). The Court will also consider Plaintiff's counsel's notice of appearance, the Amended EEOC Charge, and Plaintiff's Rebuttal. Although the Complaint does not reference or attach these documents, courts routinely take judicial notice of EEOC charges and related filings as public documents. *See, e.g.*, *Reppert v. N.Y. State Dep't of State*, No. 19-cv-1518 (BKS/CFH), 2022 WL 2315603, at *1 n.3 (N.D.N.Y. June 28, 2022) (noting that a court may take judicial notice of EEOC charges "because they are public records" and collecting cases); *Hawley v. OPWDD-Cent. NY DDSO*, No. 24-cv-248 (AJB/TWD), 2025 WL 1127447, at *11 (N.D.N.Y. Apr. 16, 2025) (noting that EEOC charges

11

are "public records of which the Court may ordinarily take judicial notice"); *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 591 n.1 (E.D.N.Y. 2013) (taking judicial notice of EEOC charge as a "public document filed in an administrative proceeding" which was "integral" to the plaintiff's discrimination claims). Here, although Defendant asserts that it was unaware of the Amended EEOC Charge, the document indicates that it was emailed to the EEOC under the appropriate charge number. Dkt. No. 16-3 at 3. The Court therefore takes judicial notice of the Amended EEOC Charge as a public document in an administrative proceeding.

The Amended EEOC Charge asserts charges of race discrimination and retaliation, lists the earliest date the alleged discrimination took place as October 24, 2023, and checks the box for "continuing action." Dkt. No. 16-3 at 2. The statement of facts included with the Amended EEOC Charge spans 83 paragraphs and in large part tracks the allegations of the Complaint through February 2025. *See id.* at 4-15. With two exceptions addressed below, Defendant does not contest that the Amended EEOC Charge was sufficient to exhaust Plaintiff's Title VII claims. Defendant nevertheless argues that the Amended EEOC Charge "does not establish that Plaintiff sufficiently exhausted her administrative remedies" because Defendant "was not aware of and did not have an opportunity to respond to [its] allegations" and therefore the EEOC's right-to-sue letter "should only be interpreted to encompass the claims in the EEOC Charge." Dkt. No. 17 at 7. But Defendant does not cite any authority to support this argument, and the Second Circuit has stated that "the omission on the part of [the EEOC] to notify defendants" of a charge "would not bar" the plaintiff's suit. *Smith v. Am. President Lines, Ltd.*, 571 F.2d 102, 107 n.8 (2d Cir. 1978); *see also Robinson v. Macy's*, No. 14-cv-4937, 2014 WL 6997598, at *8 (S.D.N.Y. Dec. 5, 2014) (noting that the "majority of circuit courts agree, having either held, or suggested, that the EEOC's failure to comply with its statutory duty of providing notice to Title VII respondents does not prejudice a

12

plaintiff's ability to maintain a Title VII claim against those respondents in federal court" and collecting cases). The Court therefore declines to dismiss or limit the scope of Plaintiff's Title VII claims on this basis.

Defendant next argues that any Title VII claim "based on events that allegedly occurred prior to April 3, 2024," i.e., 300 days before Plaintiff filed the EEOC Charge on January 28, 2025, should be dismissed as time-barred. Dkt. No. 17 at 8; *see Littlejohn*, 795 F.3d at 322 (noting that a Title VII complainant must file her charge of discrimination with the EEOC "within 300 days of the alleged discriminatory conduct") (citation omitted). The Court declines to consider this argument, which was raised for the first time in Defendant's reply memorandum of law. *See Whittaker v. Univ. Surgical Assocs., LLP*, No. 19-cv-227 (BKS/ATB), 2019 WL 4932829, at *3 (N.D.N.Y. Oct. 7, 2019) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered.") (citation omitted).

Finally, Defendant argues that Plaintiff's Title VII claims should be dismissed to the extent they are based on events allegedly occurring after the EEOC issued its right-to-sue letter on August 21, 2025, including Plaintiff's claim of constructive discharge. Dkt. No. 14-3 at 9; Dkt. No. 17 at 9-10. Plaintiff responds that her claims occurring after the EEOC's investigation are reasonably related to the claims alleged in the EEOC Charge and Amended EEOC Charge. Dkt. No. 16 at 18-25.

Title VII claims "not raised in an EEOC complaint may still be part of the complaint later filed in federal court 'if they are reasonably related to the claim filed with the agency.'" *Littlejohn*, 795 F.3d at 322 (citation omitted). The Second Circuit has recognized three "kinds" of claims which are "reasonably related" to allegations in an EEOC charge: (1) where the "conduct complained of would fall within the scope of the EEOC investigation which can reasonably be

13

expected to grow out of the charge of discrimination," (2) where the plaintiff alleges "retaliation by an employer against an employee for filing an EEOC charge," and (3) where the plaintiff alleges "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993) (internal quotation marks and citations omitted), *superseded by statute on other grounds as stated in Duplan v. City of New York*, 888 F.3d 612 (2d Cir. 2018).

Here, the Court concludes that Defendant has not shown that Plaintiff's allegations occurring after August 21, 2025 are not "reasonably related" to her allegations of racial discrimination and hostile work environment in the EEOC Charge and Amended EEOC Charge. Plaintiff's allegations that Mr. Almond used the N-word at work and that she was retaliated against for complaining about Mr. Almond's conduct and about an unfounded write-up, for example, involve the same actors and similar conduct as that alleged in the Amended EEOC Charge. These post-investigation events therefore could fall within the scope of the EEOC investigation which could reasonably be expected to grow out of the Amended EEOC Charge.

District courts in the Second Circuit "have come to different conclusions regarding whether an unexhausted constructive discharge is reasonably related to allegations of a hostile work environment made in an administrative charge." *Langlois v. Hartford Bd. of Educ.*, No. 16-cv-1746, 2019 WL 13271842, at *7 (D. Conn. Aug. 5, 2019); *see Refermat v. Lancaster Cent. Sch. Dist.*, No. 14-cv-712, 2017 WL 10296874, at *6 (W.D.N.Y. Nov. 14, 2017) (collecting cases), *report and recommendation adopted*, 2018 WL 3640220 (W.D.N.Y. Aug. 1, 2018). Because hostile work environment and constructive discharge claims "are often premised on the same type of non-discrete conduct," *Langlois*, 2019 WL 13271842, at *7 (citation omitted), the Court here concludes that, drawing all reasonable inferences in Plaintiff's favor, her constructive discharge

14

claim is reasonably related to the claim of hostile work environment raised before the EEOC. *See, e.g.*, *Smith v. Donahoe*, No. 11-cv-6243, 2014 WL 693002, at *5 & n.2 (W.D.N.Y. Feb. 21, 2014) (finding that constructive discharge claim was reasonably related to claim of hostile work environment alleged in EEOC complaint, and further noting that the plaintiff "could not have" raised a constructive discharge claim in the EEOC complaint because she had then not yet applied for retirement); *Dunbar v. County of Saratoga*, 358 F. Supp. 2d 115, 129 (N.D.N.Y. 2005) (denying motion to dismiss constructive discharge claim on exhaustion grounds where claim was "based upon, at least in part, allegations that plaintiff was subjected to 'obscene, offensive and degrading behavior,' which fairly describe[d] the allegations contained in her EEOC complaint"); *Pugni v. Reader's Digest Ass'n, Inc.*, No. 05-cv-8026, 2007 WL 1087183, at *24 (S.D.N.Y. Apr. 9, 2007) (finding constructive discharge claim reasonably related to allegations of a hostile work environment where the plaintiff claimed that her employer "created an environment that was intolerable to her because of and through its responses to her claims of sexual harassment").

To the extent Defendant argues that, as a matter of law, Plaintiff necessarily did not exhaust any claims arising out of post-investigation conduct because the EEOC was not aware of those allegations, the Second Circuit has recognized that post-investigation conduct may fall within one of the three *Butts* exceptions when a timely federal suit remains pending. *See Duplan*, 888 F.3d at 623-24 (noting that the "reasonably related" doctrine has been applied to retaliation "that occurs after the EEOC investigation is complete" and making "clear" that such claims "are excused from the exhaustion requirement *only* if they arise during the pendency of an EEOC investigation *or* a timely filed federal case").

Accordingly, the Court finds that Defendant has not met its burden at this stage of demonstrating that Plaintiff failed to exhaust her administrative remedies with respect to any part

15

of her Title VII claims. Defendant's motion to dismiss or limit Plaintiff's Title VII claims is therefore denied without prejudice to raising the defense at a later stage.

### B.    Section 1981 Claim

Defendant argues that Plaintiff has not stated a claim under 42 U.S.C. § 1981 because she does not allege intentional discrimination based on race or that she suffered the loss of a legally protected right. Dkt. No. 14-3 at 11-12. Plaintiff responds that she has alleged facts showing discriminatory intent, disparate treatment, and a race-based hostile work environment. Dkt. No. 16 at 25-27.

Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, [and] give evidence . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(1). To state a claim for race discrimination under Section 1981, a plaintiff must allege "(1) the plaintiff is a member of a racial minority; (2) defendant's intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Flanagan v. Girl Scouts of Suffolk Cnty., Inc.*, No. 23-7900-cv, 2025 WL 1501751, at *3 (2d Cir. 2025) (summary order) (quoting *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 848 (2d Cir. 2022)). A plaintiff "must initially plead and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 341 (2020).

To survive a motion to dismiss a Section 1981 claim, a plaintiff must allege that she is a member of a protected class, was qualified, and suffered an adverse employment action and can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation. *See Littlejohn*, 795 F.3d at 311.[3]

---

[3] The "same elements constitute a claim for employment discrimination under 42 U.S.C. § 1981 as constitute a claim under Title VII." *White v. Eastman Kodak Co.*, 368 F. App'x 200, 201 n.1

### 1.    Failures to Promote

With respect to Plaintiff's claim that she was denied promotional opportunities, Defendant argues that she does not allege "any specifics regarding the other applicants . . . aside from their race" and that Plaintiff does not allege the loss of a legally protected right because, although not initially selected, she was promoted to the supervisor position a few weeks later. Dkt. No. 14-3 at 12.

Assuming without deciding that Defendant's failure to promote Plaintiff by initially selecting Ms. Moore only to promote Plaintiff a few weeks later constitutes an adverse employment action for purposes of a Section 1981 claim, the Court agrees that Plaintiff has not alleged facts to meet her minimal burden of alleging that race was at least one but-for cause of the failure to promote in late 2023. Although Plaintiff alleges that Ms. Moore was white and less qualified, she alleges no facts about the applicants' respective qualifications or any other facts suggesting that Defendant's selection of Ms. Moore was due to Plaintiff's race. Indeed, Plaintiff's allegations regarding the time period from her hiring to her application for the supervisor position pertain to her complaints about food safety issues and do not have anything to do with race. *See* Dkt. No. 1 ¶¶ 14-28. Plaintiff therefore has not plausibly alleged her race was a but-for cause of Defendant's initial failure to promote her. *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 n.5 (2d Cir. 2021) (noting that "[a]pplication of the but-for causation standard at the

---

(2d Cir. 2010) (summary order) (citation omitted); *see also Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225-27 (2d Cir. 2004) (noting that "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981" and listing four exceptions not relevant here). And although Section 1981 has the more stringent "but-for" causation standard, at the motion to dismiss stage courts are "primarily concerned with whether there is minimal support for the proposition that the employer was motivated by discriminatory intent" and a plaintiff need only plead that the unlawful discrimination was at least "one but-for cause" of the adverse employment action. *Flanagan*, 2025 WL 1501751, at *4 (citations omitted).

17

pleading stage is not affected by the *McDonnel Douglas* burden-shifting framework" or "decisions in the Title VII context applying a more lenient standard at the pleading stage").

To the extent Plaintiff challenges Defendant's selection of Mr. Almond's cousin to be Assistant Manager in August 2025, however, Plaintiff has sufficiently alleged that her race was a but-for cause of the selection. In addition to Plaintiff's race-related allegations preceding August 2025, she alleges that she was informed Mr. Almond had used the N-word at work the week before and that his cousin had less experience. Dkt. No. 1 ¶¶ 83, 85.

Accordingly, the Court grants Defendant's motion to dismiss Plaintiff's Section 1981 claim to the extent it is premised on Defendant's alleged failure to promote her in November or December 2023.

### 2.    Race-Based Hostile Work Environment

Although not raised in Defendant's moving papers, Plaintiff argues that she also pleaded a claim of race-based hostile work environment under Section 1981. Dkt. No. 16 at 27. Defendant argues in reply that Plaintiff "fails to explain how the alleged discriminatory conduct is both objectively and subjectively severe or pervasive." Dkt. No. 17 at 11. But it is *Defendant's* burden on its motion to dismiss to demonstrate that Plaintiff has failed to plausibly allege this claim. In any event, courts have "repeatedly concluded" that the use of the N-word in the workplace is "particularly odious and offensive." *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 262 (E.D.N.Y. 2019) (collecting cases). Here, where Plaintiff alleges that her direct supervisor and other employees in supervisory positions used the N-word in the workplace, and that she was subject to other racial epithets and jokes, the Court declines to dismiss Plaintiff's Section 1981 claim to the extent it is premised on a race-based hostile work environment.

18

### C.    New York Labor Law Claim

Defendant argues that the Complaint fails to state a claim under New York Labor Law § 740 because Plaintiff fails to allege that she (1) held a reasonable belief that Defendant's conduct violated any law, rule, or regulation or posed a substantial and specific danger to public health or safety; or (2) experienced any retaliatory adverse employment action. Dkt. No. 14-3 at 13-14.

Section 740 of the New York Labor Law prohibits an employer from taking "any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation *or* that the employee reasonably believes poses a substantial and specific danger to the public health or safety" or because the employee "objects to, or refuses to participate in any such activity, policy or practice." N.Y. Labor Law § 740(2)(a), (c) (emphasis added).[4] "Retaliatory action" is defined as an "adverse action taken by an employer . . . to discharge, threaten, penalize, or in any other manner discriminate against any employee" for exercising her rights under Section 740. *Id.* § 740(1)(e). To state a claim under Section 740, a plaintiff must allege (1) an activity protected by the statute, (2) a retaliatory action, and (3) "some causal connection between the protected activity and the adverse action." *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 276 (S.D.N.Y. 2025) (citation omitted).

Here, Plaintiff alleges that she and other employees were instructed to "sell food past its expiration date" and "change labels when state health inspectors conducted on-site inspections."

---

[4] Section 740 was amended effective January 2022. Under the prior version of the statute, employees were only protected from retaliation for reporting or objecting to an activity, policy, or practice that in fact was "in violation of law, rule or regulation" *and* which "present[ed] a substantial and specific danger to the public health or safety." N.Y. Labor Law § 740(2)(a) (2019). Cases the parties cite preceding 2022 are therefore not necessarily applicable.

Dkt. No. 1 ¶ 18. Plaintiff voiced her opposition by saying things like "There are kids eating this food," and "You're not being honest about the food." *Id.* at ¶ 19. These allegations are sufficient to plausibly allege that Plaintiff reasonably believed what employees were being instructed to do violated the law and/or posed a substantial danger to the public who would be consuming this food. *See also id.* at ¶ 22 (referencing her "reports of *illegal* food safety issues") (emphasis added); *Noble v. 93 Univ. Place Corp.*, 303 F. Supp. 2d 365, 375 (S.D.N.Y. 2003) (denying summary judgment on Section 740 claim and rejecting argument that "the mislabeling of food [by omitting ingredients] does not threaten the health and safety of the public").

Finally, Defendant contends that Plaintiff did not experience a retaliatory adverse employment action after her alleged food safety complaint because, although her work hours were reduced, they were "restored to her normal schedule" a week later. Dkt. No. 14-3 at 14. This argument does not account for the statutory definition of "retaliatory action," which includes "adverse employment actions *or threats to take* such adverse employment actions." N.Y. Labor Law § 740(1)(e) (emphasis added). Here, Plaintiff alleges that, the day after her complaint to Human Resources about the food safety issues, Mr. Almond gave her unemployment application papers and stated that "he planned on cutting her hours and would eventually terminate her." Dkt. No. 1 ¶ 23. Because Plaintiff's hours were temporarily cut, and because Mr. Almond's statement could reasonably be construed as a threat to terminate Plaintiff's employment, Plaintiff has plausibly alleged a retaliatory action. *See Bevilacqua v. Depuy Synthes Sales, Inc.*, No. 23-8154, 2024 WL 5146061, at *2 (E.D.N.Y. Dec. 17, 2024) (noting that the 2022 amendment to Section 704 "broaden[s] the scope of impermissible retaliatory action to include not only adverse employment actions, but also threats of such actions").

Accordingly, Defendant's motion to dismiss Plaintiff's Section 740 claim is denied.

## IV.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss, Dkt. No. 14, is **GRANTED in part**; and it is further

**ORDERED** that Plaintiff's claim pursuant to 42 U.S.C. § 1981 (third cause of action) is **DISMISSED** to the extent it is premised on Defendant's alleged failure to promote Plaintiff in November or December 2023; and it is further

**ORDERED** that Defendant's motion to dismiss is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: May 28, 2026

_____

Elizabeth C. Coombe
U.S. District Judge

21